**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SEBASTIANO CANNISTRACI,**

                                             **Plaintiff,**

       **vs.**                                              **1:10-cv-980**
                                                            **(MAD/DRH)**

**RODGER KIRSOPP, Individually and**
**as an agent, servant, and/or employee of the**
**State of New York; JOHN DOE, whose**
**name is presently unknown, Individually**
**and as an agent, servant and/or employee**
**of the State of New York; and RICHARD**
**ROE, whose name is presently unknown,**
**Individually and as an agent, servant**
**and/or employee of the State of New York,**

                                             **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**KINDLON & SHANKS, P.C.**                **GENNARO D. CALABRESE, ESQ.**
74 Chapel Street                          **TERENCE L. KINDLON, ESQ.**
Albany, New York 12207
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**                **AARON M. BALDWIN, AAG**
**STATE ATTORNEY GENERAL**                **ADAM SILVERMAN, AAG**
The Capitol                               **C. HARRIS DAGUE, AAG**
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

       On August 13, 2010, Plaintiff brought this action pursuant to 42 U.S.C. § 1983 alleging

that Defendant violated his Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights.  *See*

*generally* Dkt. No. 1.  Currently before the Court is Defendant's motion for summary judgment.
*See* Dkt. No. 21.

## II. BACKGROUND

Defendant is an Investigator with the New York State Police Bureau of Criminal
Investigations.  *See* Dkt. No. 21-1 at ¶ 1.[1]  Defendant's employment is based out of the Clifton
Park Barracks (the "Barracks").  *See id.* at ¶ 5.  Defendant's primary investigative responsibilities
include the investigation of alleged felonies occurring within his Barrack's geographic region
(Clifton Park, Halfmoon, Waterford, and the Mechanicville area).  *See id.* at ¶ 7.

On March 11, 2009, the alleged victim's mother, M.N.,[2] and the alleged victim's twenty-
year-old sister, K.N., came to the Barracks and reported a series of sexual offenses involving
Plaintiff and the alleged victim.  *See id.* at ¶ 8.  M.N. and K.N. reported a sexual relationship
between Plaintiff, who was fifty-nine years old at that time, and the alleged victim, a fourteen-
year-old girl.  *See id.* at ¶ 9.  Defendant interviewed M.N., who informed him that her daughter
had recently attempted to commit suicide and had been admitted to Ellis Hospital for treatment
and counseling.  *See id.* at ¶ 10.  M.N. further informed Defendant that, while receiving treatment,
the alleged victim disclosed to counselors that Plaintiff sexually abused her.  *See id.* at ¶ 11.[3]

_____

[1] Unless otherwise noted, the facts set forth in this Memorandum-Decision and Order are
undisputed.

[2] The Court will refer to the alleged victim's family members  by their initials and will
withhold other identifying information in an effort to protect the identity of the alleged victim and
her family.

[3] The Court notes that, in his response to Defendant's statement of material facts, Plaintiff
admits that M.N. spoke to Defendant, "but den[ies] that there was a sexual relationship between
[Plaintiff] and [the alleged victim]."  *See* Dkt. No. 27-1 at ¶ 11.  Plaintiff does not deny that the
alleged victim made these statements to her counselor at Ellis Hospital or that M.N. relayed these

(continued...)

When questioned regarding Plaintiff's relationship to the family, M.N. informed Defendant that Plaintiff is the ex-boyfriend of the alleged victim's aunt , Ms. G.  *See id.* at ¶ 12.  Plaintiff and Ms. G. had lived together for a period of two years, but had since ended their relationship and lived separate from one another.  *See id.*  M.N. went on to inform Defendant regarding the nature of her families' relationship with Plaintiff, as well as some details regarding some alleged incidents between Plaintiff and the alleged victim.  *See id.* at ¶ 13.

Following his interview with M.N., Defendant spoke with K.N., who verified the information provided by M.N.  *See id.* at ¶ 14.  K.N. further informed Defendant of the following: (1) she had located $500.00 in the alleged victim's purse; (2) Plaintiff is a flirtatious person who had made passes at her but she had dismissed them; (3) three months earlier, Plaintiff took the alleged victim and a friend to the mall and, when they returned, the alleged victim was upset and stated that Plaintiff was "weird;" and (4) she had listened to at least one recorded telephone conversation where Plaintiff stated that he "wanted to come up and have sex with" the alleged victim.  *See id.*

That same day, Defendant conducted a "Spectrum Justice System" ("SJS") search on Plaintiff, which revealed two prior criminal infractions not related to the alleged crime.  *See id.* at

---

³(...continued)
allegations to Defendant.  Plaintiff is simply denying/challenging the veracity of the alleged victim's allegations against him.

Throughout his response, Plaintiff often admits the content of the numbered paragraphs of Defendant's statement of material facts, but adds the following qualifying language: "but deny that there was a sexual relationship between [Plaintiff] and [the alleged victim]."  Since Plaintiff is not denying that the allegations were made, or that they were relayed to Defendant by various parties, the Court will not cite to this denial each time it is made.  The Court fully understands that Plaintiff denies that there was a sexual relationship between himself and the alleged victim. The Court will only consider these contested statements of material fact as asserting that such allegations were made, not that such conduct between Plaintiff and the alleged victim actually occurred.

¶ 16.  Later that day, M.N. returned to the Clifton Park Barracks with the alleged victim and A.R., the alleged victim's friend.  *See id.* at ¶ 17.  Defendant then proceeded to interview the alleged victim, while Investigator Britten interviewed A.R.  *See id.* at ¶ 18.

While Investigator Britten interviewed A.R. in another room, the alleged victim relayed the following information to Defendant:

> (a) She had been having sexual relations with the plaintiff since she was twelve (12) when her aunt first met and started dating him;

> (b) Her family was close with the plaintiff and he would invite them to his home for gatherings and to use his pool;

> (c) The plaintiff would make comments to the alleged victim stating that she was beautiful and make comments regarding her clothing selection and would call her a "sex pot;"

> (d) She thought that the plaintiff was very flirtatious and thought that it was "weird" when he would make comments.  She wouldn't get uncomfortable because of the comments but knew that her aunt would get upset by them;

> (e) In late June 2007, she and her family were at the plaintiff's residence to use his pool and the plaintiff came up behind her and grabbed her buttocks.  At the time she was wearing a bathing suit and was located at the side of the plaintiff's home tending to his garden.  She did not do anything about the incident and did not inform her parents as to the inappropriate touching.

> (f) At the plaintiff's birthday party, she was passing out pizzas and dropped them to the floor.  While picking them [up], the plaintiff knelt down and placed his hand up her shorts to touch her buttocks.  Again, she did not tell anyone about the inappropriate touching.

> (g) She had been meeting the plaintiff on her own without the knowledge of her parents.  This had taken place by either she or the plaintiff calling the other to arrange a meeting, usually once per week.  She would sneak out of the house by climbing out of her bedroom window, on to the roof and deck and then walk down her street towards the intersecting road.  There, she would get into his car and they would drive around Clifton Park.

4

(h) From time to time when she would meet him he would give her money, usually around $300 and sometimes more.

(i) The plaintiff would drive her around Clifton Park, take her to Dunkin Donuts and Hannaford where she would purchase food and drinks or buy a magazine.

(j) The meetings would usually coincide with the plaintiff's soccer league that meets on Wednesdays at the Sports Plex, Clifton Park.

(k) The weekend after her school let out in 2008 the plaintiff supplied alcohol for her and her acquaintances.

(l) In the summer of 2008, just prior to leaving for a trip to New York City, the plaintiff persuaded her to meet with him so he could provide her some money for the trip.  She agreed to meet with him and once her parents went to sleep, she snuck out of the house to meet with him.  The plaintiff picked her up in his car and drove her to the Barney Road Clubhouse.  There, he parked in the parking lot on the right side, in the first space directly across from the golf course entrance.  She indicated that she did not believe it smart to park there because three cars drove by while they were sitting there.  He began to speak to her by asking where her parents were, where her sister was and whether or not anyone would be looking for her.  When she indicated that everyone was sleeping, he turned the conversation, stating that he couldn't wait for her to turn eighteen (18) years old.  She responded by [saying] that she too could not wait until she turned eighteen (18) because she wanted to go to parties and to go dancing.  The plaintiff then told her that she was beautiful and a "sex pot."  The plaintiff then stated that he wanted to have sex with her at that time.  He then reached over, pulled on the seat lever and pushed on her shoulder, pushing her back in a laying position.  The plaintiff then began to kiss her neck, unbutton her blouse, grab her inner thigh and pull her shorts down to mid-thigh.  The plaintiff then climbed over and sat on top of her.  While panting and grunting, he managed to insert his penis into her vagina.  After pushing approximately two times into her vagina, she told him to stop and pushed him back causing him to strike the car visor.  The plaintiff immediately got off of her and sat in the driver's seat.  The plaintiff sat silent for approximately one minute, then apologized repeatedly.  She told him that it was ok and to drop her off at her house.  The plaintiff promised to make it up to her and then dropped her off where he had picked her up.  The plaintiff then told her to keep it a secret and that he would make it up to her.  She stated that she was with the plaintiff for about an hour and that his penis was approximately five (5) or six (6) inches long and was

> unsure if he was circumcised.  The plaintiff was wearing soccer
> shorts and an "Italia" t-shirt.
>
> (m) A couple of days after the sexual assault described in
> sub-paragraph (l), the plaintiff called her and advised that he had
> some money and asked how much she wanted whereby she
> responded that she wanted $500.00.  Approximately three to four
> days later, the plaintiff contacted her and requested to meet her.
> She then met with the plaintiff on Seneca Drive where she gave him
> a hug and he gave her $500.00.  She advised that she spent the
> money on clothes and various other items.

*See id.* at ¶ 19.

Investigator Britten's interview with A.R. yielded information that corroborated several of

the alleged victim's allegations.  Specifically, A.R. (1) verified the existence of the shopping trip

that the alleged victim described to Defendant; (2) verified that Plaintiff drove her and the alleged

victim to the shopping trip in his white SUV; (3) stated that Plaintiff inappropriately touched the

alleged victim; (4) informed Investigator Britten that the alleged victim told her that Plaintiff had

previously raped her and was bribing her with money; and (5) informed Investigator Britten that

she and the alleged victim conducted a three-way phone call with Plaintiff that they recorded in

which Plaintiff allegedly stated that he had "'both hands on [his] dick'" and requested that the

alleged victim "talk dirty" to him.  *See id.* at ¶ 22 (citation omitted).  Thereafter, Investigator

Britten reduced his interview with A.R. to a sworn written deposition.  *See id.* at ¶ 23 (citations

omitted).

After his initial interview, Defendant re-interviewed the alleged victim.  At this later

interview, the alleged victim disclosed additional incidents with Plaintiff she had not previously

disclosed.  *See id.* at ¶ 20.  The alleged victim described other times when she performed oral sex

on Plaintiff, often for money, and other alleged inappropriate incidents.  *See id.*; *see also* Dkt. No.

22 at 59-64.

After returning home on March 11, 2009, A.R. informed her mother that the alleged

victim's mother brought her to the Barracks to give a statement to Defendant. *See* Dkt. No. 21-3

at 197.[4]  According to A.R.'s mother, A.R. was upset because she had lied to Defendant. *See id.*

Further, A.R. informed her mother that she had been promised money to be a witness for the

alleged victim and to lie. *See id.* at 199.  Upon learning this, A.R.'s mother called the State Police

and eventually spoke with Defendant. *See id.*  A.R.'s mother informed Defendant that A.R. had

been promised money to be a witness against Plaintiff and to lie. *See id.*  A.R.'s mother asked

Defendant to withdraw her daughter's statement in light of what was revealed. *See id.* at 200.[5]

On March 12, 2009, Defendant interviewed Ms. G., the alleged victim's aunt. *See* Dkt.

No. 21-1 at ¶ 27.  Ms. G. recalled several incidents, including that, in the summer of 2006, she

was driving back from New Jersey when she called Plaintiff who advised that he was at their

home. *See id.*  When Ms. G. arrived at the home, she found the alleged victim and C.S., one of

the alleged victim's friends, at the house. *See id.*  Plaintiff did not tell Ms. G. that the alleged

victim was there when she called and Ms. G. recalled that both girls' parents believed that their

daughters were at the mall. *See id.*  Moreover, Ms. G. informed Defendant that Plaintiff has a

mark on his penis and that it is approximately five-to-seven inches long and uncircumcised. *See*

---

[4] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

[5] The Court notes that Defendant disputes that A.R.'s mother informed him that A.R. lied in the statement that she provided or that she was offered money by the alleged victim's family. *See* Dkt. No. 27-4 at 48-49.  Defendant contends that he spoke with A.R.'s mother immediately before her daughter provided her statement and then again the following day. *See id.*  Defendant testified that A.R.'s mother made it clear that she did not trust or like the alleged victim's family, but Defendant denied that A.R.'s mother told him that A.R. provided a false statement. *See id.* at 49-50; *see also* Dkt. No. 27-3 at 34-36.

*id.* No written statement was taken from Ms. G. at that time because she was unfocused and was unsure about some of the information that she was providing. *See id.* at ¶ 28.

Also on March 12, 2009, Defendant re-interviewed K.N., who stated that Plaintiff had, on several occasions, made passes at her and that she had found as much as $600 in various belongings of the alleged victim's. *See id.* at ¶ 29. In addition to discussing several sexual advances that Plaintiff made towards her in the past, K.N. also informed Defendant that the alleged victim had played her a recorded telephone conversation in which Plaintiff stated the following: "'I am going to come up there and fuck you. Is that what you want?'" *See id.* K.N. indicated that the conversation made it sound like Plaintiff thought that he could improve the alleged victim's mood by having sex with her. *See id.*

Defendant again re-interviewed the alleged victim on March 24, 2009. *See id.* at ¶ 34. The alleged victim informed Defendant that the first sexual contact between herself and Plaintiff occurred in June of 2007, when she was twelve-years old. *See id.* Moreover, the alleged victim admitted to arranging a meeting with Plaintiff on March 22, 2009 at approximately 10:00 p.m., and advised that the purpose of the meeting was to get Plaintiff to admit to having sex with her. *See id.* The alleged victim also produced her cellular telephone and played Defendant her recorded messages. *See id.* In one of the previously recorded conversations, Plaintiff "stated that he had 'both hands on [his] dick' and referred to the alleged victim as his 'Dirty.'" *See id.* In the recording, Plaintiff "also requested that [the alleged victim] perform oral sex on him and she said that she couldn't." *See id.* On March 25, 2009, Defendant obtained the alleged victim's cellular telephone and the recorded conversations were retrieved using a micro-cassette recorder. *See id.* at ¶¶ 36-39.

Later in the day on March 25, 2009, Defendant contacted M.N. to make arrangements for a controlled telephone call to Plaintiff from the alleged victim's cellular telephone. *See id.* at ¶ 40. At 9:57 p.m., in Defendant's presence, the alleged victim contacted Plaintiff and requested that he come to her home to meet with her. *See id.* at ¶ 42. Plaintiff advised the alleged victim that he was drinking wine with some guys at Sports Plex, but indicated that she should contact him in thirty minutes. *See id.* At 10:39 p.m., the alleged victim contacted Plaintiff and again requested that Plaintiff meet her. *See id.* at ¶ 43. Plaintiff advised her that he was just dropping off his neighbor in Colonie, but would meet her in fifteen minutes outside of her residence in Clifton Park. *See id.*

At this point, Investigator Britten established vehicle surveillance of Plaintiff. *See id.* at ¶ 45. As Plaintiff approached the residence, Troopers Lasher and Gough executed a vehicle stop and placed Plaintiff into custody without incident. *See id.* Investigator Britten and Defendant interviewed Plaintiff at the Barracks starting at 11:16 p.m. *See id.* at ¶ 50. Upon entering the interview room, Plaintiff stated that he wanted to know who made the allegations against him. *See id.* Plaintiff questioned if the alleged victim's father (D.N.), M.N., or Ms. G. was behind his arrest. *See id.* Plaintiff stated that he had been called by the alleged victim that night and thought that she needed money, so he agreed to meet her. *See id.* Plaintiff continued to defend himself by alleging that he was a "nice guy" and that Ms. G. had always accused him of having a relationship with her niece, but that it was not true. *See id.* Defendant advised Plaintiff of his legal rights, but Plaintiff waived them and continued to speak to Defendant and Investigator Britten. *See id.* at ¶ 51. While defending himself, Plaintiff admitted that he was going to meet the alleged victim, but only to give her the money that she had requested. *See id.* At first Plaintiff admitted to having attempted to meet with the alleged victim on one other occasion without her parents' knowledge,

but then admitted to having met with her on another occasion.  *See id.*  When questioned about the recorded telephone conversation in which Plaintiff stated to the alleged victim that he was masturbating, Plaintiff asked whether he needed to speak to an attorney and the interview ended. *See id.*

After the interview ended, Plaintiff was processed for Rape in the Second Degree.  *See id.* at ¶ 52.  Following processing, Plaintiff's person, including his genitalia, was photographed. *See id.*  Plaintiff was then arraigned at the Clifton Park Town Court and remanded to the Saratoga County jail in lieu of $25,000 cash or $50,000 bond.  *See id.* at ¶¶ 53-54.[6]

In the days following Plaintiff's arrest, Defendant interviewed several other individuals, including the alleged victim's friend C.S.  *See id.* at ¶¶ 57-61.  C.S. informed Defendant that she had observed Plaintiff "kissing, grabbing and touching the alleged victim inappropriately on numerous occasions," that Plaintiff inappropriately touched her leg in the summer of 2007 when they were going to see the play "Grease" in Albany, and that Plaintiff wanted to purchase items for the alleged victim in Victoria's Secret in Crossgates Mall.  *See id.* at ¶ 60.  C.S. could not, however, provide any first hand knowledge of any sexual acts between Plaintiff and the alleged victim.  *See id.* at ¶ 61.

On April 1, 2009, Defendant and Investigator Wyche went to Colonie, New York and arrested Plaintiff for Predatory Sexual Assault of a Child and provided him with an appearance ticket.  *See id.* at ¶ 65.  Plaintiff was then transported to the Colonie Police Department where he was processed without incident.  *See id.*  Plaintiff was arraigned at the Colonie Town Court and was remanded to the Albany County Jail without bail being set.  *See id.* at ¶ 66.

---

[6] Plaintiff was never indicted on the Saratoga County charge of rape in the Second Degree and, on June 4, 2010, the charge was dismissed by a Clifton Park Town Justice, pursuant to a motion submitted by the Saratoga County District Attorney's office.

On April 3, 2009, Defendant contacted S.B. of Colonie regarding a police report he filed regarding Plaintiff on June 25, 2008. *See id.* at ¶ 70. S.B. informed Defendant that he filed the police report because Plaintiff had, among other things, repeatedly told his daughter that she was beautiful, invited his daughter into his residence to look at his birds, requested that his daughter turn and walk away from him so that he could look at her buttocks, and repeatedly approached his daughter to offer her rides to school. *See id.* S.B. also informed Defendant that he and his son approached Plaintiff, who did not deny the incidents alleged had taken place. *See id.*

On April 23, 2009, Defendant interviewed B.W. in the presence of her mother. *See id.* at ¶ 75. B.W. informed Defendant that she had observed Plaintiff touching the alleged victim at his residence the previous summer after he had jumped into bed with her and that Plaintiff had provided alcohol to the alleged victim, two boys who they had met at Plaintiff's residence, and herself. *See id.*

On September 11, 2009, Defendant provided testimony in a grand jury proceeding against Plaintiff at the Albany County District Attorney's Office. *See id.* at ¶ 83. The grand jury ultimately indicted Plaintiff on the charge presented. *See id.* Plaintiff contends that, during the grand jury presentation, Defendant "deliberately concealed" that A.R.'s mother informed him that her statement was false and provided because she was promised money. *See* Dkt. No. 27-6 at 10 (citations omitted); *but see* Dkt. No. 27-4 at 48-50. The Assistant District Attorney in charge of Plaintiff's criminal trial, Alison Thorne, does not recall being told by Defendant that A.R.'s mother had claimed that her daughter provided a false statement. *See* Dkt. No. 21-2 at ¶ 14. A.R.'s mother did, however, call Ms. Thorne approximately one week before Plaintiff's criminal trial commenced and informed Ms. Thorne that A.R. provided a false statement for the promise of money. *See id.* at ¶ 16. On the Friday before Plaintiff's criminal trial began, Ms. Thorne

informed Plaintiff's criminal defense counsel that A.R.'s mother called her office and to inform her that A.R.'s statement was false. *See id.* at ¶ 18. Despite this revelation, Ms. Thorne still decided to proceed with Plaintiff's criminal trial. *See id.*

Prior to the commencement of Plaintiff's criminal trial, the court dismissed several counts of the indictment on Plaintiff's motion. During trial, several additional charged were dismissed by the court and the jury ultimately acquitted Plaintiff on the remaining charges. *See* Dkt. No. 27 at ¶ 12.

On August 13, 2010, Plaintiff commenced this civil rights action. In his complaint, Plaintiff alleges that Defendant violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights by subjecting him to a denial of liberty, unlawful search and seizure, and malicious prosecution. *See* Dkt. No. 1. Plaintiff also asserts that Defendant is liable under New York common law for malicious prosecution.

## III. DISCUSSION

### A.   Standard of review

#### *1. Summary judgment standard*

A court may grant a motion for summary judgment only if the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quoting *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d at 58) (other citation omitted). Furthermore, in assessing the record to determine whether any such issues of

material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See id.* at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).

Federal Rule of Civil Procedure 56 provides that, if a non-moving party fails to oppose a summary judgment motion, then "summary judgment, *if appropriate,* shall be entered against the adverse party." Fed. R. Civ. P. 56(e)(2) (emphasis added).  The Second Circuit has made clear, however, that where the non-moving party "chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial[,]" *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir. 2001), and that he is entitled to judgment as a matter of law, *see Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996) (quoting Fed. R. Civ. P. 56(c)).

Moreover, in determining whether the moving party has met its burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  Rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. Relief under 42 U.S.C. § 1983

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

## B.      Official capacity

Defendant asserts that Plaintiff's claims against him in his official capacity are barred by the Eleventh Amendment.  *See* Dkt. No. 21-4 at 4.

The Eleventh Amendment to the United States Constitution bars federal courts from exercising subject matter jurisdiction over claims against states for retrospective relief absent their consent to such a suit or an express statutory waiver of immunity.  *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 90-100 (1984); *see also Huminski v. Corsones*, 386 F.3d 116, 133 (2d Cir. 2004) (citation omitted).  It is well-settled that states are not "persons" under section 1983 and, therefore, Eleventh Amendment immunity is not abrogated by that statute.  *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989).  Moreover, this immunity

extends to state agencies and state officials sued in their official capacities for retrospective relief. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Huminski*, 386 F.3d at 133 (citation omitted). "Nonetheless, state officials can be subject to suit in their official capacities for injunctive or other prospective relief." *Huminski*, 386 F.3d at 133 (citation omitted).

Since Plaintiff is not seeking prospective injunctive relief against Defendant, Plaintiff's claims against Defendant in his official capacity are barred by the Eleventh Amendment. *See Estes-El v. Town of Indian Lake*, 954 F. Supp. 527, 536-37 (N.D.N.Y. 1997) (holding that the Eleventh Amendment bars suit for money damages against the New York State Police and a New York State Trooper in his official capacity) (citation omitted); *see also Terranova v. New York*, 144 Fed. Appx. 143, 147 (2d Cir. 2005) (citing *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002)).

## C.   False arrest

"A § 1983 claim for false arrest, . . . including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law[.]" *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).  Under both New York law and the Fourth Amendment to the United States Constitution, the elements of a false arrest action are as follows: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (quotation omitted).

Defendant does not contest the first three elements.  Accordingly, the only question is whether Plaintiff's arrest was "privileged" or "justified."  "'Justification may be established by

showing that the arrest was based on probable cause.'" *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quotation omitted).  Probable cause exists "when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quotation omitted). "The existence of probable cause must be determined on the basis of the totality of the circumstances, . . . and 'where law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all.'" *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (internal citation and quotation omitted).  "An officer retains probable cause to arrest a plaintiff 'even if the probable cause was for a crime different from what the police officers believed to have been committed.'" *Davis v. City of New York*, 373 F. Supp. 2d 322, 330 (S.D.N.Y. 2005) (quotation and other citations omitted).[7]

Defendant arrested Plaintiff for, and subsequently charged him with, Rape in the Second Degree, a Class D Felony, in Saratoga County.  In order to convict a person of rape in the second degree, the prosecution must establish that a person, "being eighteen years old or more, . . . engage[d] in sexual intercourse with another person less than fifteen years old[.]"  N.Y. Penal Law § 130.30(1).  The New York's Penal Law defines "sexual intercourse" as having "its ordinary meaning and occurs upon any penetration, however slight."  N.Y. Penal Law § 130.00(1). Thereafter, Defendant arrested Plaintiff in Albany County and charged him with Predatory Sexual Assault of a Child pursuant to N.Y. Penal Law § 130.96.  "A person is guilty of predatory sexual

---

[7] Although probable cause is a defense to both false arrest and malicious prosecution claims, the probable cause analysis for each claim requires a slightly different analysis. Therefore, the Court will analyze Plaintiff's false arrest and malicious prosecution claims separately. *See Kavazanjian v. Rice*, No. 03-CV-1923, 2005 WL 1377946, *4 (E.D.N.Y. June 6, 2005) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569, 571 (2d Cir. 1996)).

assault against a child when, being eighteen years old or more, he or she commits the crime of rape in the first degree, criminal sexual act in the first degree, aggravated sexual abuse in the first degree, or course of sexual conduct against a child in the first degree, as defined in this article, and the victim is less than thirteen years old."  N.Y. Penal Law § 130.96.  "A person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct or anal sexual conduct with another person . . . [w]ho is less than thirteen years old and the actor is eighteen years old or more."  N.Y. Penal Law § 130.50(4).

Contrary to Plaintiff's assertions, Defendant had probable cause to arrest Plaintiff.  As set forth in greater detail above, Defendant began his investigation on March 11, 2009, when the alleged victim's mother (M.N.) and sister (K.N.) came to the Barracks and reported a complaint of sexual offenses involving the alleged victim and Plaintiff.  *See* Dkt. No. 21-1 at ¶ 8.  Among other things, K.N. informed Defendant that she had listened to at least one recorded telephone conversation where Plaintiff stated that he wanted to come to Clifton Park and have sex with the alleged victim.  *See id.* at ¶ 14.  Later that same day, M.N. returned to the Clifton Park Barracks with the alleged victim and A.R.  *See id.* at ¶ 17.  At this point, the alleged victim informed Defendant about her extensive history with Plaintiff, which included numerous instances of inappropriate touching and sexual contact.  *See id.* at ¶¶ 19-20.

Construing the facts in Plaintiff's favor, at first, A.R. provided testimony that corroborated the alleged victim's statement but A.R.'s mother later called Defendant and informed him that A.R. had lied in her statement and that this lie was induced by the alleged victim's family and their promise of money.  If Defendant conducted no further investigation, and if Plaintiff was immediately arrested with Defendant relying solely on the information he received on March 11, 2009, Plaintiff may be correct that Defendant acted without probable cause in arresting him.

Defendant, however, continued to conduct a thorough investigation into Plaintiff's alleged conduct, that continued for an additional two weeks after A.R.'s statement was called into question.[8]

For example, on March 12, 2009, Defendant contacted the Town of Colonie Police Department and spoke with Sergeant Gerald, who informed Defendant that Plaintiff had several contacts with the Colonie Police Department, including two incidents involving suspected inappropriate contact with fourteen-year-old females. *See id.* at ¶ 26. That same day, Defendant interviewed Ms. G. and re-interviewed K.N., who both provided testimony that corroborated allegations made against Plaintiff. *See id.* at ¶¶ 27-30. On March 23, 2009, Defendant re-interviewed Ms. G. who again provided testimony that corroborated some of the allegations made against Plaintiff. *See id.* at ¶ 32. Then, on March 24, 2009, Defendant re-interviewed the alleged victim, at which point she was able to clarify several dates and places, as well as circumstances surrounding several of the alleged incidents. *See id.* at ¶ 34. This statement was reduced to a sworn written deposition.

Thereafter, on March 25, 2009, Defendant obtained the alleged victim's cellular telephone and listened to and recorded several recorded conversations between the alleged victim and Plaintiff. *See id.* at ¶¶ 37-39. The Court has reviewed these recordings, which Defendant submitted as an exhibit, and in the very first recording, Plaintiff states that he "has both hands on [his] dick" and, when asked why, states "because I like it" and "because I'm horny." *See* Dkt. No. 22-2 at 211 (Audio Recordings filed traditionally with the Court). Later that day, Defendant had

---

[8] The Court notes that, although A.R.'s mother indicated that her daughter's statement was a lie, the Court has listened to the recording to which A.R. refers in her statement and she accurately described the recorded conversation that took place between the alleged victim and Plaintiff.

the alleged victim make a controlled telephone call to Plaintiff, whereby the alleged victim asked Plaintiff to come to her home and meet with her.  *See* Dkt. No. 21-1 at ¶ 42.  At 10:39 p.m., the alleged victim contacted Plaintiff a second time and Plaintiff advised her that he was just dropping off his neighbor in Colonie and that he would meet her in fifteen minutes outside of her residence in Clifton Park.  *See id.* at ¶ 43.  Upon driving past the alleged victim's residence, New York State Troopers Lasher and Gough executed a vehicle stop and took Plaintiff into custody. *See id.* at ¶ 45.

"While probable cause requires more than a 'mere suspicion' of wrongdoing, *Mallory v. United States*, 354 U.S. 449, 454, 77 S. Ct. 1356, 1 L. Ed. 2d 1479 (1957), its focus is on 'probabilities,' not 'hard certainties,' *Illinois v. Gates*, 462 U.S. 213, 231, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). . . ."  *Koester v. Lanfranchi*, 288 Fed. Appx. 764, 766 (2d Cir. 2008) (other citation omitted).  "Thus, just as 'a police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest,' . . . an officer is not required to eliminate every possible line of impeachment that might apply to a victim complainant[.]"  *Id.* (citing *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989)) (internal quotation and citation omitted).

The evidence that Defendant collected prior to both of Plaintiff's arrests clearly established probable cause as to each of the crimes charged.  Although the fact that A.R.'s mother recanted her daughter's statement and indicated that A.R. was offered money for the fabrication may have weakened the case eventually put to trial, the overwhelming amount of other evidence corroborating the alleged victim's allegations, including the audio recordings of Plaintiff speaking in a sexually explicit manner to the alleged victim on multiple occasions, provided sufficient probable cause for Defendant to arrest Plaintiff.

19

Based on the foregoing, the Court grants Defendant's motion for summary judgment as to Plaintiff's false arrest claim.[9]

### D.     Malicious prosecution

"The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person – *i.e.*, the right to be free of unreasonable or unwarranted restraints on personal liberty." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995).  To assert a Fourth Amendment claim for malicious prosecution under section 1983, a plaintiff must show a deprivation of her liberty consistent with the concept of "seizure," so as to ensure that the harm suffered is of "constitutional proportions."  *See id.*

The elements of malicious prosecution under section 1983 are virtually identical to the elements of the same claim under New York law.  *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (citations omitted).  To state a cause of action for malicious prosecution in New York, the plaintiff must prove "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'"  *Jocks v.*

---

[9] In addition to having probable cause to arrest Plaintiff for the crimes charged, Defendant had probable cause to arrest Plaintiff for a number of different crimes.  For example, a person is guilty of Endangering the Welfare of a Child in New York when "[h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his or her life or health."  N.Y. Penal Law § 260.10(1).  Numerous sources confirmed that, on multiple occasions, Plaintiff provided the alleged victim and her friends with alcohol.  These uncontroverted allegations are sufficient to support a charge of Endangering the Welfare of a Child.  *See, e.g., People v. Simpkins*, 284 A.D.2d 185, 185 (1st Dep't 2001); *see also Kavazanjian v. Rice*, No. 03-CV-1923, 2005 WL 1377946, *4 (E.D.N.Y. June 6, 2005) (holding that, in the false arrest context, an officer only needs probable cause to arrest the suspect for an offense, regardless of what the suspect is ultimately charged with) (quotation omitted).

20

*Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (quotation omitted).  To sustain a malicious

prosecution claim pursuant to section 1983, "the state law elements must be met, and there must

also be a showing of a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's

Fourth Amendment rights.'"  *Rutligliano*, 326 Fed. Appx. at 8-9 (quoting *Rohman v. New York*

*City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).  "Unlike an arrest, which only requires

probable cause that 'the suspect had committed . . . *an* offense[,]' a prosecution requires probable

cause 'to charge [the suspect] with *each* of the crimes.'"  *Kavazanjian v. Rice*, No. 03-CV-1923,

2005 WL 1377946, *4 (E.D.N.Y. June 6, 2005) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d

563, 569, 571 (2d Cir. 1996)) (emphasis added).  As such, when considering Plaintiff's malicious

prosecution claim, the Court must individually consider each count with which Plaintiff was

charged.  *See id.* (quotation omitted).


### 1. Probable cause

"In the context of a malicious prosecution claim, probable cause under New York law is

the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief

that he has lawful grounds for prosecuting the defendant in the manner complained of."

*Rounseville v. Zahl*, 13 F.3d 625, 629–30 (2d Cir. 1994) (internal quotations and citations

omitted); *see also Colon v. New York*, 60 N.Y.2d 78, 82 (1983) (holding that probable cause to

prosecute consists of "such facts and circumstances as would lead a reasonably prudent person in

like circumstances to believe plaintiff guilty").  "[T]he existence of probable cause is a complete

defense to a claim of malicious prosecution in New York."  *Savino*, 331 F.3d at 72; *see also*

*Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010).

"In New York, the fact that the Grand Jury returned an indictment against [the plaintiff] creates a presumption that his arrest and indictment were procured with probable cause." *Bernard v. United States*, 25 F.3d 98. 104 (2d Cir. 1994): *see also Manganiello*, 612 F.3d at 162. "That presumption may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Manganiello*, 612 F.3d at 162 (quotation omitted); *see also McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006). "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Savino*, 331 F.3d at 73; *see also Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004) ("The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct . . .").

"In order to survive a motion for summary judgment on the malicious prosecution claim, [the plaintiff] must have submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Savino*, 331 F.3d at 73. The presumption of probable cause is not rebutted "with mere 'conjecture' and 'surmise.'" *Id.* (citing *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also Sclafani v. Spitzer*, 734 F. Supp. 2d 288, 299 (E.D.N.Y. 2010) (holding that "mere conjecture and surmise that an indictment was procured as a result of conduct undertaken in bad faith cannot overcome the presumption of probable cause created in an indictment" (quotations and citation omitted)); *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 229 (S.D.N.Y. 1999) ("To survive a motion for summary judgment [on a malicious prosecution claim], plaintiff must present admissible facts and may not rely on bare allegations of facts, ultimate or conclusory facts, or legal conclusions").

"[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quotations and citations omitted).  However, "[i]n order for probable cause to dissipate, the groundless nature of the charge must be made apparent [to the defendants] by the discovery of some intervening fact." *Lowth*, 82 F.3d at 571; *see also Husbands ex rel. Forde v. City of New York*, 335 Fed. Appx. 124, 128 (2d Cir. 2009) (citation omitted).  "[T]he question is whether either the evidence gathered after arrest undermined a finding of probable cause, or whether the . . .Defendants' inquiry into the alleged [crime] so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause." *Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 227 (E.D.N.Y. 2010).  "[D]efendants are not obliged to exonerate [the] plaintiff or uncover exculpatory evidence, but the 'failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Lawrence v. City Cadillac*, No. 10 Civ. 3324, 2010 WL 5174209, *6 (S.D.N.Y. Dec. 9, 2010) (quoting *Lowth*, 82 F.3d at 571).

In the present matter, Plaintiff has come forward with sufficient evidence to overcome the presumption of probable cause created by the grand jury's indictment.  Plaintiff contends that Defendant never informed the assistant district attorney or the grand jury that he had reason to believe that A.R. lied in the statement that she provided and that this lie was allegedly procured by the alleged victim and her family through the promise of money.  Although sufficient probable cause existed to arrest Plaintiff, Defendant's failure to provide this exculpatory information to the prosecuting attorney or the grand jury creates a material issue of fact as to Plaintiff's malicious prosecution claim.  *See Colon v. City of New York*, 60 N.Y.2d 78, 82-83 (1983) (holding that "[t]he presumption may be overcome only by evidence establishing that the police witnesses have

not made a complete and full statement of facts either to the Grand Jury or to the District

Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or

otherwise acted in bad faith" (citations omitted)).

Specifically, Plaintiff was arrested in Saratoga County on March 25, 2009 and then again

in Albany County on April 1, 2009.  On September 11, 2009, Defendant provided testimony in a

grand jury proceeding against Plaintiff at the Albany County District Attorney's Office.  In the

more than five months that passed from Plaintiff's initial arrest to when Defendant testified before

the grand jury, Defendant failed to inform the prosecuting attorney about A.R.'s mother's

allegation that her daughter's statement was procured through the promise of money.  This

omission creates a question of fact defeating Defendant's motion for summary judgment as to

Plaintiff's Fourth Amendment malicious prosecution claim.  *See Chetrick v. Cohen*, 52 A.D.3d

449, 450 (2d Dep't 2008) (holding that the presumption of probable cause created by the grand

jury's indictment """may be overcome only by evidence establishing that the police witnesses have

not made a complete and full statement of facts either to the Grand Jury or to the District

Attorney, that they have misrepresented or falsified evidence, [or] that they have withheld

evidence or otherwise acted in bad faith""" (quotations omitted)); *see also Ramos v. City of New*

*York*, 285 A.D.2d 284, 299-300 (1st Dep't 2001) (holding that "New York law has long equated

the civil defendant's failure to make a full and complete statement of the facts to the District

Attorney or the court, or holding back information that might have affected the results, with that

defendant's initiation of a malicious prosecution" (citations omitted)).

### *2. Actual malice*

Actual malice "'does not require a plaintiff to prove that the defendant was motivated by spite or hatred[,]'" but instead that he initiated or continued the criminal proceeding "'due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994) (quotation omitted).  Actual malice typically is shown by circumstantial evidence, including a lack of probable cause.  *See Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977).  Both the Second Circuit and New York courts have held that, although

> "lack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue." . . .  A jury may infer the [existence] of actual malice from the absence of probable cause.

*Maxwell v. City of N.Y.*, 156 A.D.2d 28, 34 (1st Dep't 1990) (quotation and other citation omitted); *see also Lowth*, 82 F.3d at 573 (holding that, "[i]n most cases, the lack of probable cause – while not dispositive – tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause" (internal quotation omitted)).

In the present matter, Plaintiff has again met his burden of establishing an issue of fact precluding summary judgment as to this claim.  Defendant's alleged failure to inform the prosecuting attorney and the grand jury about the issues regarding A.R.'s statement could lead a reasonable jury to conclude that Defendant was driven by an improper motive in continuing Plaintiff's prosecution – something other than a desire to see the ends of justice served.  *See Lowth*, 82 F.3d at 573.  The fact that Ms. Thorne indicated that she would still have presented the case to the grand jury even had she been informed that A.R.'s mother called Defendant and informed him that A.R.'s written statement was false and that it had been induced by the alleged

25

victim's family, and even though she still proceeded to trial, is not dispositive. *See* Dkt. No. 21-2 at ¶¶ 19-20.

In light of the Court's finding that a question of fact remains regarding the probable cause determination and because of the nature of Defendant's failure to reveal exculpatory evidence to both the district attorney and the grand jury, the Court finds that an issue of fact precludes granting Defendant's motion for summary judgment as to Plaintiff's malicious prosecution claim. *See Lundgren v. Margini*, 30 A.D.3d 476, 477 (2d Dep't 2006) (holding that a finding that the defendant lacked probable cause could support an inference of actual malice) (citation omitted).

### E.     Plaintiff's Fourteenth Amendment claim

Plaintiff asserts that Defendant violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose exculpatory evidence to him, the prosecution, and the grand jury that indicted him. *See* Dkt. No. 27-6 at 22 (citation omitted). Plaintiff claims that this failure amounted to a denial of his Fourteenth Amendment right to due process of law. *See id.* (citation omitted).

"Under *Brady* and its progeny, 'the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment.'" *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (quoting *United States v. Jackson*, 345 F.3d 59, 70 (2d Cir. 2003)). "To establish a *Brady* violation, a defendant must show (1) that the evidence at issue is 'favorable to [him], either because it is exculpatory', or because it is impeaching; (2) the 'evidence must have been suppressed by the State, either

willfully or inadvertently'; and (3) 'prejudice must have ensued.'" *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

As the Supreme Court has explained,

> [the materiality analysis] is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) (footnote omitted). "Materiality is assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, . . . relief is not warranted." *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (citations omitted).

"Because Brady and its progeny are grounded in the Due Process Clauses of the Constitution, the essential purpose of the rules enunciated in these cases is to protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *Bagley*, 473 U.S. at 675, 105 S. Ct. 3375). "Thus, a *Brady* violation occurs only where the government suppresses evidence that 'could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)) (other citations omitted). As such, since the Second Circuit has held that it "'is not feasible or desirable to specify the extent of the timing of [the] disclosure *Brady* and its progeny require,'" it has "never interpreted due process of law as requiring more than that *Brady*

material must be disclosed in time for its effective use at trial." *Coppa*, 267 F.3d at 142 (quotation and other citations omitted).

Plaintiff claims that Defendant failed to abide by his *Brady* obligations by failing to inform the grand jury that A.R.'s mother called him and informed him that her daughter provided a false statement against Plaintiff for the promise of money from the alleged victim and her family. *See* Dkt. No. 27-6 at 22-23. Therefore, Plaintiff asserts that his Fourteenth Amendment rights were violated even though the evidence was brought to the prosecution's and defense's attention shortly before trial and even though he was acquitted of the charges brought against him. *See id.* Plaintiff directs the Court to two distinct lines of cases: one which permits recovery by a plaintiff in a civil suit for an alleged *Brady* violation despite the fact that he was acquitted of the criminal charges that form the basis of his civil rights action, and a second line of cases which hold that an acquittal precludes such a claim.

In *Ambrose v. City of New York*, 623 F. Supp. 2d 454 (S.D.N.Y. 2009), the plaintiff alleged that the defendants violated his Fourteenth Amendment Due Process rights when they failed to turn over *Brady* material. *See Ambrose*, 623 F. Supp. 2d at 467. Specifically, the plaintiff claimed that the defendants failed to turn over two witnesses' statements exculpating him from the alleged criminal conduct. *See id.* Despite these alleged *Brady* violations, the plaintiff was acquitted. *See id.* As such, the question before the court was whether "a Section 1983 plaintiff may adequately allege a violation of his *Brady* due process rights in the absence of the plaintiff's criminal conviction." *Id.* at 468. The defendants cited cases supporting their position "that an individual's *Brady* right is violated only when the suppression of exculpatory information reasonably undermines confidence in the verdict;" and, therefore, the defendants argued that even if they should have disclosed the exculpatory evidence, the plaintiff's *Brady* rights were still not

violated because he was acquitted of the criminal charges leveled against him.  *Id.*  The plaintiff, however, disagreed and argued that "a rule barring the acquitted from asserting their *Brady* rights in a Section 1983 action would provide insufficient incentives for law enforcement officials to comply with their *Brady* obligations."  *Id.*

Agreeing with the defendant's, the *Ambrose* court first discussed the fact that, although neither the Supreme Court nor the Second Circuit have "had occasion to examine a case in which an acquitted defendant sought vindication of his or her *Brady* rights in a Section 1983 action, their opinions have often used language suggesting that *Brady* does not extend to such a situation."  *Id.* For example, the court cited a list of cases in which both the Second Circuit and the Supreme Court have stated that "'the essential purpose of [*Brady* and its progeny] is to protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him.'"  *Id.* (quoting *Coppa*, 267 F.3d at 139) (other citations omitted); *see also Strickler v. Greene*, 527 U.S. 263, 281 (1999) (holding that "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict").  Thereafter, the court found that the Second Circuit's holdings regarding the timing of *Brady* disclosures "reinforce this focus on ultimate disposition of criminal charges."  *Id.* Specifically, the *Ambrose* court found that, "[t]o the extent that the third *Brady* prong – the requirement that failure to disclose exculpatory evidence resulted in prejudice to a criminal defendant – is ambiguous as to whether the requisite prejudice can be shown absent a criminal conviction, the Second Circuit has indicated that *Brady* does not mandate disclosure of evidence any earlier than the point in time at which the criminal defendant needs access to the evidence so that he or she may effectively use it at a proceeding that determines guilt."  *Id.* at 468-69 (citing *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) ("It is not feasible or desirable to specify the

extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made.  Thus, *disclosure prior to trial is not mandated*" (emphasis added))) (other citations omitted).

Finally, the *Ambrose* court noted that "[m]ost courts that have directly considered the question have held that an acquittal extinguishes a Section 1983 plaintiff's due process claim for nondisclosure of *Brady* material."  *Id.* at 469 (citing *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998); *Ramirez v. County of Los Angeles*, 397 F. Supp. 2d 1208, 1214 (C.D. Cal. 2005)) (other citations omitted).  Considering these precedents, as well as the minority position advanced by the plaintiff, the court rejected the plaintiff's arguments and held that "the verdict acquitting Plaintiff of the criminal charges against him negates any violation of his *Brady* rights and extinguishes any Section 1983 due process claim that might arise from Defendants' alleged suppression of exculpatory evidence."  *Id.* at 471.

Plaintiff cites to *Carroccia v. Anderson*, 249 F. Supp. 2d 1016 (N.D. Ill. 2003), in support of his position that an acquittal in the underlying criminal action does not bar his Fourteenth Amendment Due Process claim for the concealment of exculpatory material.  *See* Dkt. No. 27-6 at 23.  In *Carroccia*, the plaintiff alleged that when the defendants provided the prosecutors with the results of their investigation, they concealed evidence tending to exculpate him.  *See Carroccia*, 249 F. Supp. 2d at 1020.  The plaintiff claimed that he was indicted based on this failure, but was eventually acquitted of the charges.  *See id.*  In his civil rights action, the plaintiff claimed, among other things, that the defendants violated his right to a fair trial by concealing this alleged *Brady* material.  *See id.* at 1022.

Agreeing with the plaintiff that his Fourteenth Amendment claim was not barred because of his acquittal in the criminal matter, the court held that "[i]f courts prohibit a criminal defendant from making a civil claim for concealment of material exculpatory evidence simply because his trial resulted in an acquittal, we tolerate law enforcement misconduct simply because the defendant was able to overcome it by other means.  In this Court's view, such an approach undermines the important interests protected by *Brady* and its progeny."  *Id.* at 1023.  Concluding, the court held that,

> [i]n sum, to determine in the context of a civil suit under § 1983 whether law enforcement breached its duty under *Brady*, the court must evaluate the officer's action on a prospective basis, not a retrospective one.  The question is whether, at the time the evidence is concealed, it could be expected to affect the outcome of the case.  An eventual acquittal may suggest that the withheld evidence was not material.  But an acquittal alone does not show that police officers complied with *Brady* or that the defendant's trial was fair.  As we have noted, an unfair trial can still—for completely independent reasons—result in an acquittal.  The constitutional value at stake in *Brady* is due process: the means, not the ends of his trial.

*Id.* at 1024.

Having reviewed the relevant caselaw on point, the Court agrees with Defendant that Plaintiff's acquittal precludes his Fourteenth Amendment claim alleging a violation of his rights under *Brady* and its progeny.  As the court noted in *Ambrose*, the position set forth in *Carroccia* is the minority position and the continued validity of the *Carroccia* holding has been called into serious doubt by a recent Seventh Circuit decision.  In *Carvajal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008), the Seventh Circuit noted that "we are doubtful . . . that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation."  *Carvajal*, 542 F.3d at 570.  Even more recently, Senior District Judge Garvin Murtha of the District of Vermont agreed with the

*Ambrose* court's position and rejected the minority position argued here by Plaintiff. *See Grenier v. Jonas*, No. 1:09-CV-121, 2010 WL 883743, *4 (D. Vt. Mar. 5, 2010).

The Court is unpersuaded by Plaintiff's claim that the holding set forth today will "'undermine[ ] the important interests protected by *Brady* and its progeny.'" *See* Dkt. No. 27-6 at 23. Even though most of the cases evaluating *Brady* violations have been in the context of appeals from criminal convictions, the Supreme Court and the Second Circuit have indicated that a criminal defendant's *Brady* right to disclosure of exculpatory evidence is violated only in the case of prejudice to the ultimate conviction of the criminal defendant. *See, e.g., Strickler*, 527 U.S. at 281-82; *Coppa*, 267 F.3d at 140. When a criminal defendant is acquitted notwithstanding an alleged *Brady* violation, the criminal defendant has not suffered prejudice and *Brady* has not been implicated.[10] Finally, considering that Ms. Thorne provided Plaintiff with this exculpatory/impeaching material before his criminal trial, Plaintiff did not suffer the prejudice required to establish a *Brady* violation since he was clearly able to use this material at trial to impeach his accusers.

---

[10] Contrary to Plaintiff's assertions, a criminal defendant who has been acquitted despite the prosecuting authority's or investigating officer's failure to provide exculpatory material is not necessarily without recourse. First, as Plaintiff himself argues, and as the caselaw supports, such a criminal defendant, in the appropriate circumstances, may be able to bring a claim for false arrest and/or malicious prosecution. Moreover, in the Second Circuit, *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007), provides a remedy for wrongful pretrial detention caused by police mishandling or concealing evidence. A Fourth Amendment claim under *Russo* requires a plaintiff to show "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'" *Russo*, 479 F.3d at 205 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Based on the foregoing, the Court holds that Plaintiff has failed to state a claim for violation of the Fourteenth Amendment's Due Process Clause based on his allegations that evidence favorable to him was improperly suppressed.

**F.      Qualified immunity**

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis in original). "Where the right at issue in the circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in

violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612, F.3d 149, 165 (2d Cir. 2010) (citations omitted).  "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. . . .  That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'" *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact.  *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted).  "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court.  However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court.  *See id.* at 368 (citation omitted).  Any unresolved factual issues, however, must be resolved by the jury.  *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted).  Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

In the present matter, the Court finds that, even if it did not grant Defendant's motion for summary judgment as to Plaintiff's false arrest claim, it would find that Defendant is entitled to qualified immunity as to that claim.  Considering all of the circumstances, it was objectively reasonable for Defendant to believe that he had probable cause to arrest Plaintiff on March 25, 2009 and April 1, 2009, notwithstanding the fact that A.R.'s mother allegedly informed him that her daughter's statement was false and procured by the alleged victim's family.  Defendant conducted a thorough investigation leading up to Plaintiff's arrests and gathered substantial evidence from a number of different sources, which all supported Defendant's objectively reasonable belief that Plaintiff had committed a number of crimes against the alleged victim.  Moreover, as discussed above, although A.R.'s mother allegedly informed Defendant that her daughter's statement was a lie, the Court has listened to the recording to which A.R. refers in her statement and she accurately described the recorded conversation that took place between the alleged victim and Plaintiff.  Therefore, at least part of A.R.'s statement appears to have been truthful.

Regarding Plaintiff's malicious prosecution claim, however, issues of fact preclude the Court from granting Defendant qualified immunity.  As discussed above, the fact that Defendant allegedly withheld from the district attorney and the grand jury exculpatory evidence overcomes the presumption of probable cause and could allow a reasonable jury to find that Defendant acted with malice.  It is beyond question that an officer's duty to turn over both exculpatory and impeachment evidence was well-established at the time in question, and, therefore, the Court cannot find, as a matter of law, construing the disputed evidence in Plaintiff's favor, that Defendant acted objectively reasonable in failing to reveal this evidence.

Based on the foregoing, the Court finds that Defendant is entitled to qualified immunity as to Plaintiff's false arrest claim, but that questions of fact exist which preclude the Court from finding that Defendant is entitled to qualified immunity as to Plaintiff's malicious prosecution claim.

## G.      Plaintiff's Fifth, Sixth and Eighth Amendment claims

Defendant asserts that Plaintiff's Fifth, Sixth and Eighth Amendment claims fail as a matter of law because his complaint is devoid of any allegations consistent with an equal protection claim, excessive force claim, or a denial of his right to counsel.  *See* Dkt. No. 21-4 at 23.  In his response to Defendant's motion for summary judgment, Plaintiff agrees to withdraw these claims.

Since Plaintiff has not opposed Defendant's motion for summary judgment on these claims and because there is no basis for these claims in the record, the Court deems these claims abandoned.  *See Bowan v. Cnty. of Westchester*, 706 F. Supp. 2d 475, 492 (S.D.N.Y. 2010) (citations omitted); *Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 305 (D. Conn. 2009) (deeming abandoned all but the plaintiff's excessive force and municipal liability claims where the plaintiff's opposition memorandum to the defendants' motion for summary judgment addressed only those claims).[11]

---

[11] The Court notes that, since Plaintiff's lawsuit does not allege any deprivation of his rights by the federal government, any due process claim he has against Defendant is properly brought under the Due Process Clause of the Fourteenth Amendment, not under that of the Fifth Amendment.  *See Mitchell v. Home*, 377 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2005) (holding that "[t]he Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials.  Any due process rights plaintiff enjoys as against state government

(continued...)

**H.      State-law claims**

In his complaint, in addition to his federal causes of action, Plaintiff asserts several state-law causes of action.  District courts have supplemental jurisdiction over all state-law claims that are so related to federal claims over which they exercise original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.  *See* 28 U.S.C. § 1367(a).  Application of supplemental jurisdiction is discretionary, however, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law."  *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted).

The only state-law claim that Plaintiff set forth in his complaint is a common law malicious prosecution claim.  As discussed above, "[t]he elements of . . . malicious prosecution under § 1983 are substantially the same as the elements under New York law."  *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) (quotation omitted).  Likewise, where "the record plainly reveals the existence of genuine issues of material fact relating to the qualified immunity defense [for the plaintiff's federal law claims,] . . . New York courts are no different in this regard." *Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir. 2006) (citation omitted).

---

[11](...continued)
officials . . . arise solely from the Fourteenth Amendment due process clause" (internal citation omitted)).  Also, to the extent that Plaintiff claims that his grand jury indictment was unfair due to, among other things, the nondisclosure of exculpatory evidence to the grand jury, such a complaint does not state a Fifth Amendment claim, as the Grand Jury Clause of the Fifth Amendment has not been incorporated against the states through the Fourteenth Amendment. *See Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972).

Since Plaintiff's common law malicious prosecution claim is "part of the same case or controversy" as his section 1983 malicious prosecution claim, the Court retains supplemental jurisdiction over this state-law claim.  In light of the Court's holding regarding Plaintiff's section 1983 malicious prosecution claim, the Court denies Defendant's motion for summary judgment as to Plaintiff's state-law malicious prosecution claim.


**IV. CONCLUSION**

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part**;[12] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 16, 2012
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[12] As a result of this Memorandum-Decision and Order, the only claim that remains for trial is Plaintiff's malicious prosecution claim.